# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| PETER GRAYSON, on behalf of himself and all other similarly situated,<br><br>       Plaintiff,<br><br>   v.<br><br>BMW OF NORTH AMERICA LLC and BAYERISCHE MOTOREN WERKE AKTIENGESELLSCHAFT AG MUNICH GERMANY,<br><br>       Defendants. | Civil Action No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Peter Grayson alleges for his class action complaint the following through his attorneys Squitieri & Fearon, LLP, on behalf of himself and all others similarly situated based on personal knowledge as to his own vehicle and upon information and belief as to all other matters.

## PRELIMINARY STATEMENT

1.     This is a class action brought by the Plaintiff, Peter Grayson ("Plaintiff"), on behalf of himself and all other similarly situated purchasers  and lessees of BMW vehicles from model years 2013 through the present which, with the sunsetting of 3G services by wireless carrier partners, will no longer be able to operate the functions of the "Connected Drive/BMW Assist" ("CD/BA") systems installed in the cars (collectively, the "Cars"), as detailed herein. Defendants made numerous representations and provided warranties in their marketing of the Cars regarding the CD/BA systems, when in fact, the Cars' CD/BA features were only temporary due to the design of BMW's factory equipped telematics systems installed in the Cars. The Class Vehicles' internet enabled telematic features such as roadside emergency safety features were

rendered inoperable after the 3G phase out in 2022 due to defendants' use of obsolete telematics equipment they installed in the Class Vehicles.

2.      Defendants' representations about CD/BA were false and misleading.  In the months and years following the introduction of CD/BA, as the phasing out of 3G service was being planned and 4G and 5G service was being phased in, Defendants never disclosed until April, 2021 that the "telematics" in the Cars had been built and installed with 3G only capabilities and that CD/BA would not be operable on any generation beyond 3G and could not be transitioned over to any more advanced technology (hereinafter referred to as "3G Only Limitations").

3.      By making ubiquitous misrepresentations about CD/BA and the Cars, Defendants (i) engaged in deceptive  acts in violation  of New Jersey's Consumer Fraud Act (the "NJCFA"), N.J. Stat. § 568-2, *et seq;* and (ii) breached express and implied warranties  by description  in violation  of N.J. Stat. $  12A:2-313(b) (which is also known  as UCC § 2-313(b); violated the Magnuson-Moss Warranty Act, and committed other wrongdoing.  Defendants are liable to Plaintiff and all other similarly  situated members  of the Class defined below for all damages resulting  from the claims herein.

4.      This action was commenced to obtain recompense for Class Vehicles whose telematics were rendered inoperable when 3G as phased out, or repair, retrofit or replacement of 3G telematics.

## PARTIES

5.      Plaintiff Peter Grayson is a resident of the state of New Jersey who purchased a 2014 428i xDrive Coupe in or about May 2014 from Circle BMW ("Vehicle") as a "new vehicle" in New Jersey. Marketing materials promoting the Vehicle promised CD/BA features.

6.      Defendant BMW of North America LLC ("BMW NA") is a limited liability company organized under Delaware law with its principal place of business in Woodcliff Lake, New Jersey. BMW NA is a wholly owned subsidiary of defendant "BMW AG" of Munich Germany.

7.      Defendant BMW NA is the current exclusive distributor of BMW automobiles in the United States. It imports into and markets BMW automobiles in the United States, and it sells BMW automobiles to authorized BMW dealers, who in tum sell and lease BMW automobiles to purchasers and lessees. "BMW NA" has been the exclusive distributor of BMW automobiles in the United States since BMW's entry into the US market.

8.      Defendant Bayerische Motoren Werke Aktiengesellschaft ("BMW-AG") is a duly organized German corporation with its headquarters in the City of Munich, Germany. BMW is the parent company of BMW NA.

9.      The Defendants BMW NA and BMW AG, are jointly and severally liable for the conduct alleged herein, and collectively are referred to in this complaint as "BMW" or the "Defendants."

10.     BMW NA (i) is the exclusive distributor of BMW automobiles in the United States; (ii) imports into and marketed BMW automobiles in the United States, and sold BMW automobiles to authorized BMW dealers, who in tum sold and leased BMW automobiles to purchasers and lessees; (iii) provided marketing, sales, parts, service, technology, and training support to BMW automotive retailers in the United States; and (iv) performing these functions, BMW NA has created and disseminated the misrepresentations described in this complaint.

11.     As the exclusive distributor of BMW NA automobiles in the United States, performing these functions, BMW NA has created and disseminated the misrepresentations described in this complaint.

12.     BMW AG has designed the Cars to allow its CD/BA telematics to phase out with the phasing out of 3G. BMW AG controls and oversees all aspects of BMW NA's operations including marketing. BMW AG is responsible for all manufacturing "specs" of the Cars including the installation of 3G only telematics which are the subject of this litigation.

13.     Finally, the misrepresentations alleged herein reflects a single course of action, rather than separate independent acts by the two BMW defendants.  Because BMW NA and BMW AG jointly participated in the decisions and activities alleged herein, they are jointly  and severally liable for all harm caused by their conduct.

## JURISDICTION

14.     This Court has jurisdiction  pursuant to 28 U.S.C.  §§ 1332( d) and 1453, because (1) this action is a "class action," which contains class allegations and expressly seeks certification of a proposed class of individuals;  (2) the putative Class consists of more than one hundred proposed class members;  (3) the citizenship  of at least one class member is different from Defendants' citizenship  (New Jersey and Germany);[1]  and (4) the aggregate  amount in controversy  by the claims of Plaintiff and the putative Class exceeds $5,000,000,  exclusive of interest and costs.

---

[1]     Because jurisdiction is based on the Class Action Fairness Act, 28 U.S.C. § 1332(d), even though Defendants are limited liability companies, each Defendant is a citizen of the states "where it has its principal place of business and ... under whose laws it is organized." 28 U.S.C. § 1332(d). That is, the rules applicable in traditional non-class diversity cases, under which the citizenship of limited liability companies would be determined by the citizenship of those companies'  members, do **not** apply to this case. *Erie Ins. Exch. v. Erie Indemn. Co.*, 722 F.3d 154, 161 n.7 (3d Cir. 2013) (explaining that the Class Action Fairness Act "evinces an intent that suits by unincorporated associations be treated like suits by corporations in that the citizenship of the association for diversity purposes is determined by the entity's principal place of business and not by the citizenship of its members").

15.     This Court also has personal jurisdiction over Defendants because Defendant BMW NA is headquartered and therefore "at home" in New Jersey, and moreover, the actions of the Defendants that give rise to the claims against them in this action took place and emanated from New Jersey.

16.     Venue is proper in this jurisdiction pursuant to 28 U.S.C. § 1391 because Defendants are subject to personal jurisdiction in this District, and the actions of the Defendants' that give rise to the claims against them in this action took place and emanated this District.

## CLASS ACTION ALLEGATIONS

17.     Plaintiff re-alleges and incorporates the allegations contained in the paragraphs above.

18.     Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of himself and a Class consisting of:

> All persons who purchased or leased, anywhere in the United States, a Car, with a CD/BA with 3G Only Limitations (the "Class").

19.     Plaintiff reserves the right to amend the definition of the Class.

20.     This action is properly maintainable as a class action.

21.     There are millions of members of the Class based upon the 14 million vehicles sold by BMW with telematics. Accordingly, joinder of all members is impractical.

22.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among questions of law and fact in common to the Class are:

a.      Whether Defendants misrepresented the 3G Only Limitations features of Cars;

b.      The extent of the CD/BA features which are inoperative when 3G is phased out;

c.      Whether Defendants in their marketing and sale of the Cars violated the NJCFA, N.J. S.A. §56:8-2, *et seq.* and other laws;

d.      Whether Defendants breached express and/or implied warranties when it delivered Cars with CD/BA systems with the 3G Only Limitations;

e.      The extent of damages/diminution in value/overcharges resulting from the 3G Only Limited Telematics in the Cars.

23.     Plaintiff's claims are typical of the claims of each member of each of the Class in that Plaintiff alleges a common course of conduct by BMW toward each member of the Class. Specifically, BMW violated the NJCFA and breached its warranties with each member of the Class. Plaintiff and the other members of the Class seek identical remedies under identical legal theories. There is no antagonism or material factual variation between Plaintiff' claims and those of the Class.

24.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel who have extensive experience prosecuting class actions and who, with Plaintiff, is fully capable of, and intent upon, vigorously pursuing this action. Plaintiff has no interest adverse to the Classes.

25.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Furthermore, the damage that has been suffered by any individual Class member is likely not enough to sustain the expense and burden of individual

litigation.  Hence it would be impracticable for all members  of the Class to redress the wrongs

done to them individually.  There will be no difficulty  in the management of this action as a

class action.

26.     The prosecution of separate actions against Defendants would create a risk of

inconsistent  or varying  adjudications  with respect to the individual  Class members, which

could establish  incompatible  standards  of conduct  for Defendants. In addition, adjudications

with respect to individual  members  of the Classes could, as a practical  matter, be dispositive

of the interests  of the other members  of the Classes not parties to such adjudications, or could

substantially  impede or impair their ability to protect their interests.

27.     The members of the Class are readily identifiable through Defendants' records.

28.     Defendants have acted on grounds generally applicable to the Classes with respect

to the matters complained of herein, thereby making appropriate the relief sought herein with

respect to the Classes as a whole.

## <u>SUBSTANTIVE ALLEGATIONS</u>

29.     Consumer Reports succinctly described the situation:

> "As wireless carriers shut down their 3G networks over the coming
> months, millions of cars are losing the ability to automatically
> contact first responders after a crash…
> Automatic crash notification, which alerts first responders via a
> built-in cellular connection, often relies on aging 3G cellular
> networks to connect drivers with emergency services and share a
> vehicle's location. Even though automakers have been aware that
> these networks are shutting down permanently between February
> and July, many manufacturers still relied on it until as recently as
> the 2021 model year."
> "Shutting down the 3G network to prioritize newer technologies is
> positive in the long run," says Alex Knizek, an automotive
> engineer at CR. "But it is disappointing that some automakers have
> failed to offer a solution to owners of 3G-connected vehicles,
> leaving them unable to take advantage of proven and valuable
> safety features, as well as other beneficial connectivity functions."

The reason is cost savings, according to Roger Lanctot, director of automotive connected mobility at Strategy Analytics, a consulting firm. "It's the last chapter of the automakers adopting the least-expensive connectivity module they can find," he says. Only recently did automakers start future-proofing newer models. "It's a challenge for the industry, but going forward, automakers recognize that they need to put the latest connectivity in."

In addition to crash notification, many vehicles also have an SOS button to contact emergency services, and a lot of those buttons still use a 3G network. It's usually red and located near the vehicle's dome light or rearview mirror. Some cars may also use 3G connectivity for convenience features such as remote unlocking, remote start, emergency roadside assistance, navigation map updates, and vehicle diagnostics. These and other features will no longer work without an upgrade to newer 4G or 5G technology. But because of the way many of these vehicles are designed, it can be difficult or even impossible to upgrade the technology to work with the newer networks, Lanctot says.

"What a mess," says William Wallace, CR's manager of safety policy. "Wireless carriers, federal regulators, and some automakers seem content to leave people out to dry, even if it means they lose access to a potentially lifesaving technology. Every automaker should deliver to its customers the services they've been promised—without charging them extra—and lawmakers should get ahead of the game to keep this from ever happening again in the future."

30.     BMW cars have been sold in the USA since 1956 and have been manufactured here since 1994. The product line include the X3-X7 models for the relevant period.

31.     BMWs are equipped with "Telematics Control Units" ("telematics") connected to the engine control module which are the instruments which connect the BMW to internet service. *See* http://www.tomorrowstechnician.com/bmw-telematics. December 15, 2020 by Andrew Madiel. Last accessed August 28, 2022. The CD/BA features depend on the equipment and technology of the telematics systems, not contracts with service providers.

32.     BMW has manufactured and sold over 14 million telematic equipped vehicles since 1998. The system debuted in 1998 as "BMW Telematics" and included the introduction of the "BMW Assist Package." The first systems were based on analog cellular phone connections which were phased out in 2008.

33.     As the public became increasingly aware of the capabilities and benefits of telematics, they began to demand the connectivity features from car makers. The benefits include, *inter alia*,  reduced insurance premiums and vehicle diagnosing capabilities which reduce service costs, and fuel expenses. *See* https://www.incartelematics.com/faq-items/what-cars-have-telematics (March 2021) last accessed August 27, 2022.

34.     Eventually the BMW telematics system became known as CD/BA. Earlier models of BMW cars (pre 2014) came equipped with 2G capable telematic systems. When 3G was phased in and 2G phased out, BMW car owners with 2G telematics were able to upgrade their telematics or have them retrofitted to phase into 3G. "3G" stands for third "generation" of mobile networks.

35.     In the field of mobile connections, a "generation" generally refers to a change in the fundamental nature of the service, non-backwards compatible transmission technology, higher peak bit rates, new frequency bands. Cellular connectivity has characteristic of technology, speed, frequency and spectral capabilities which are constantly being improved upon.

36.     When 3G became available BMW installed 3G capable telematics in it vehicles but refused and failed to have the 3G telematics adaptable to the next "generation" of wireless or have them capable of being retrofitted.

37. All manufacturers of 3G devices have long known that 3G was "spectrally inefficient" and would be phased out as early as possible.

38. In January 2008, the FCC auction for 700 MHZ spectrum began with Version Wireless and AT&T winning the biggest share after having stated their intentions to support LTE a/k/a 4G LTE, the next generation after 3G.

39. As early as August 2009, carriers supporting 3G began planning their upgrade to 4G LTE. On December 14, 2009 Telia Sonera became the first carrier to offer customers 4G services. *See* "First in the World with 4G Services," Telia Sonera Press Release December 14, 2009.

40. In 2014, Defendants marketed their 2014 model year cars with CD/BA. In marketing the CD/BA, Defendants made substantial efforts to highlight and promote the features of CD/BA to distinguish the Cars from its competitors' automobiles by marketing it as more technologically advanced than the competition.

41. In 2014, BMW was heavily promoting its "BMW Connected Drive" 2014 Model Updates and other series. In those promotions, BMW continuously touted its ability "to adapt to changes and advances in technology;" and that it "…continues to adapt year after year."

42. The CD/BA depended on internet access which was then marketed as "available as an option in 2014 models equipped with navigation and the latest BMW iDrive 4.2 as part of BMW online."

43. BMW's promotional materials also promised:

**BMW ConnectedDrive 2014 Model Updates**

For years, BMW ConnectedDrive has provided automotive connectivity for BMW owners, and has separated itself from similar systems, as BMW ConnectedDrive continues to adapt to changes and advances in technology. If you're currently a BMW owner, you likely know how the previous features work, but if

you're looking to purchase a new BMW, we thought it may be helpful to provide you with a closer look at the **BMW ConnectedDrive 2014 model updates**.

As we said, BMW ConnectedDrive continues to adapt year after year. The systems is currently available in 11 different countries, but the automaker expects the system to become worldwide by 2017. As the BMW vehicles in our **new car inventory** come with the US version of the ConnectedDrive system, we're going to focus strictly on the 2014 model updates that have been implemented here in the states.

One of the biggest changes to the ConnectedDrive system for all 2014 BMW models is the addition of more standard features and available services. BMW Assist, one of the many services that makes up the ConnectedDrive system, now comes standard in just about every 2014 model, and allows you to access basic features such as door unlock, enhanced roadside assistance, accident management and message dictation.

44.     The Cars were factory equipped with 3G only telematics devices but by 2014 was 3G already being replaced by 4G LTE.

45.     In car review sites and reviews, BMW Connected Drive and the Cars' technology and driver assistance features were prominently mentioned as reasons to buy a 2014 BMW. "The Top Ten Reasons Why You May Want To Buy A 2014 BMW 3-Series." https://www.car-buying-strategies.com/BMW-2014-3-series.html. Last accessed August 12, 2022.

46.     There was no suggestion that CD/BA would be rendered obsolete or that the CD/BA feature was only temporary or had only a limited life. To the contrary, Defendant marketed CD/BA as a permanent feature of the Car.

47.     BMW never informed class members of <u>any</u> of the 3G Only Limitations.

**BMW KNEW OF IMMIMENT NEW GENERATIONS OF**
**WIRELESS TECHNOLOGY AND COULD HAVE**
<u>**MANUFACTURED TELEMATICS ADAPTABLE TO NEXT GENERATION**</u>

48.   BMW is part of 5G AA Automatic Association, a "registered voluntary association" which BMW helped found in September 2016 with Audi AG, Daimler AG and five major 5G patent holders. "5G AA was created to connect the telecom industry to vehicle manufacturers to develop end-to-end solutions for future mobility and transportation services." Christopher Voight Chairman of the 5G AA Board.  *See* https://5gaa.org last accessed August 27, 2022.

49.   "BMW Group" is represented on the 5G AA board by Joachim Gothel and George Schmitt.

50.   5G AA promoted CV2X which, as designed, provides a migration path to 5G based systems and services. *See* https://enom.wikipedia.org/wiki/Vehicle-to-everything last accessed August 27, 2022.

51.   As a result of BMW's "founder" status of 5G AA it was very aware of 3G's almost automatic obsolescence as soon as it was introduced.

52.   BMW could have but chose not to design, build or install telematics with downloadable software or physical spare parts in the Cars which could allow the devices to continue to connect to wireless "generations" following 3G.

53.   BMW had the capability to retrofit its 2G telematics and did so once 3G became the prevalent technology, but refused to design the 3G telematics to be retrofitted.

54.   Even after designing and installing 3G only telematics, a technology "fix" for the 3G phase out was not impossible, or even difficult. It is costly however, but BMW could have

done it, or planned in advance by recalling cars and installing upgrades to add 4G and/or 5G capabilities.

55.     BMW could have integrated a swappable SIM card into its telematics module which could have allowed the system to upgrade itself to 4G LTD or 5G, but BMW did not do that.

56.     The 3G phase out does not necessarily automatically disable all devices working on that protocol as it has in the Cars. For example, the iPhone 3GS can connect to Wi-Fi to access internet applications even after the 3G phase out. *See* https://www.zdnet.com/google-amp/home-and-office/_____/3g-is-shutting-down-here-are-the-gadgets-that-still-rely-on-it-do-you-have-one/ ZDNET, June Wan, April 8, 2022. Last accessed August 27, 2022. Software upgrades have been developed to extend the connectivity life of 3G driven devices. *Id.*

57.     Similarly Google's Pixel 2 was released in October 2017 with hardware/software that could support 4G LTE and had been pre-armed as early as March 2017.

58.     In addition, AT&T connected iPhone 6 and Galaxy S4 Mini and later Samsung Galaxy modes and Pixel 2 Goggle models will all continue to work after the 3G phase out as will older phones from Motorola and LG. While BMW continue to install, promote and sell the 3G only devices, though the end of the Class Period, the major cellular providers have been preparing for years and hence most mobile/smartphone customers are on the 4G and/or 5G network. *See* https://www.verify-this.com/article/mews/verify/technology-verify/you-will-have-to-upgrade-replace-phone-to4g-5g-in 2022-if-you-have-3gVerizon-att-T-Mobile-all-phasing-out-3g/635-e733678c-clcd-485d-9793-7f97c003bcb9  last accessed August 28, 2022.

59.     BMW did not design, build or install the "Devices" to be able to transition to successors to 3G due to a desire to save on manufacturing costs. *Id.* quoting Ruger Lanfot, Director of Automotive Connected Mobility at Strategy Analytics.

60.     By contrast, General Motors, whose 2015 and later models of Chevrolet, Buick, GMC and Cadillac all had the proprietary "OnStar" hardware which was also affected adversely by the 3G sunsetting, announced to its customers:

> In 2021, OnStar began working with AT&T on network updates and started executing over-the-air software updates to ensure Members were not impacted by the network transition.

GM committed to automatically send "over-the-air" software updates free of charge to address the 3G phase-out.

61.     Moreover, the 3G telematics obsolescence issue was entirely foreseeable. Jeremy Barnes, a spokesperson for Mitsubishi, was quoted in Consumer Reports about the 3G phase out:

> "We foresaw this time coming and designed around it"

## SUNSETTING OF 3G AND LOSS OF CD/BA FEATURES IN THE CARS

62.     In February 2019, AT&T announced a plan to "sunset" its 3G network. *See* http://www.business.ATT.com/explore/make-the-switch.html last accessed August 27, 2022.

63.     3G "sunsetting" means that a mobile network operator (or carriers) shuts off the cellular infrastructure required to operate devices based on 3G technology.

64.     On April 22, 2021 BMW announced:

> "due to a phasing out of the 3G network by cellular carriers, Connected Drive Services can no longer be supported starting February 2022 for select vehicles."

65.     According to BMW announcements, as a result of the sunset of 3G service by wireless carrier partners by February 2022, BMW vehicles factory-equipped with 3G telematics

devices or retrofitted 2G vehicles will no longer be able to receive any ConnectedDrive/BMW

Assist services. Some vehicles factory-equipped with 4G telematics devices will no longer have

access to services that require a voice connection, such as BMW Assist eCall and Concierge

Services, but will continue to receive certain ConnectedDrive/BMW Assist services such as

Advanced Real-Time Traffic Information, Remote Services and BMW Online depending on you

BMW model.

66.     Most BMW's made before 2016 lost Connected Drive features in February 2022

when 3G was phased out. *See* https://www.import-car-com/bmw-telematics/ by Andrew Markel

August 17, 2022. Last accessed August 28, 2022.

67.     Had the Defendants truthfully disclosed and reported that its CD/BA telematics

for the Cars were 3G only, consumers would have been less likely to purchase the cars, would

have abstained outright or sought substantial discounts and/or upgrades.  As a proximate cause of

Defendants' misrepresentations detailed in this complaint,  Plaintiff and class members

purchased  Class Vehicles  in reliance  on Defendants'  misrepresentations  and omissions in  the

mistaken belief that their telematics could adapt to changing technology.

68.     Plaintiff and the class members who purchased Cars did not get the benefit of the

bargain  they  struck.  They paid for Cars under  the mistaken  belief that their cars CD/BA

telematics would work for the life of the Car as all other options. Instead, they received Cars

whose CD/BA telematics had planned obsolescence and were therefore of lesser value because

the CD/BA was destined for obsolescence as soon as it was issued. The Cars  that Plaintiff and

the class  members  paid  for and bargained  to receive,  while  marketed  as products with

CD/BA telematics were of lesser value than as advertised.  Accordingly, purchasers  of the Cars,

including  Plaintiff and class members,  have suffered and will continue  to suffer injury,

ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Cars.

69.     The Defendants' misrepresentations and deceptive conduct in failing to truthfully disclose to prospective buyers that the Cars were 3G Only caused Plaintiff and class members substantial injury in the form of price premiums and overpayments for products and diminished resale value and loss of telematics benefits described herein that are severely limited.

70.     **Tolling of the Limitations Period** The Defendants had actual knowledge for several years that the marketing and advertising of its Cars was deceptive and misleading.

71.     **Continuing Act Tolling** Beginning in or around 2014, Defendants continuously marketed and sold the Cars to unsuspecting car buyers.   The Defendants continuously represented these vehicles could adapt to technology.  By continuously repeating these false representations and failing to disclose that the Cars were 3G only the Defendants engaged in a continuing wrong sufficient to render inapplicable any statute of limitations that BMW might seek to apply.

72.     At all relevant times, the Defendants knew that they were concealing and misrepresenting material facts, but continued to misrepresent and conceal information in its marketing and sales materials.  Plaintiff and class members' claims are not time barred.

73.     **Fraudulent Concealment Tolling** State consumer protection laws, together with the doctrine of equitable tolling and/or the discovery rule, toll the applicable statutes of limitations for all class members because of Defendants' conduct, including but not limited to concealment and omission of material facts.

74.     This duty to disclose arose, among other things, due to the Defendants' representations about CD/BA.

75.     The Defendants knew about the 3G Only Limitations of the Cars ever since they started selling the Cars.

76.     Despite their knowledge, the Defendants actively concealed this material information from the Plaintiff and other class members.

77.     The Defendants actively concealed the information to continue to profit from their sale and prevent Plaintiff and other class members from bringing suit or otherwise seeking redress.

78.     Plaintiff and class members justifiably relied on the Defendants to disclose the true nature of the Cars they purchased, because the truth was not discoverable by Plaintiff and the other class members through reasonable efforts. Any applicable  statute  of limitations  has been  tolled by  the  Defendants'  knowledge,  active concealment, and denial of the facts alleged herein, which behavior is ongoing.

79.     Defendants are estopped from asserting that statutes of limitations were running for the duration of time Class Members were unaware of Defendants' misrepresentations.

80.     Defendants are equitably estopped from asserting the statutes of limitations ran against the claims of class members.

81.     Additional information supporting allegations of misrepresentations is in the control of the Defendants.

82.     Material information concealed and/or actively suppressed by the Defendants includes but is not limited to the 3G Only Limitations, described in the preceding paragraphs.

83.     Defendants had a duty to disclose to Class members the 3G Only Limitations.

84.     Defendants  breached  express and implied warranties  and actively  and affirmatively misrepresented, concealed and suppressed, both pre-sale  and post-sale,  the existence of the 3G Only Limitation.

### UNCONSCIONABLITY OF DEFENDANTS' CONDUCT

85.     The warranties  accompanying Cars were procedurally and substantively unconscionable under Uniform  Commercial  Code § 2-302 and other applicable  state warranty laws because  of the disparity  in bargaining power of the parties and the purchasers' lack of knowledge that Cars had 3G only limitations.[2]

86.     The contractual terms were unreasonably favorable to the Defendants since the Defendants  were fully aware of the 3G only limitations but proposed  class  representative and  class  members  were  unaware. The bargaining  position  of the Defendants  for the sale of Cars was grossly disproportionate  and vastly superior to that of individual  vehicle purchasers,  including  the proposed  class representative  and class members.

87.     The Defendants' conduct renders the Cars purchase contract so one-sided as to be unconscionable  under the circumstances existing at the formation  of the vehicle purchase contract.

---

[2] New  Jersey  Uniform  Commercial  Code  § 2-302  (NJ Stat.  Ann.  § 12A:2-302)  states  in pertinent part:

> (1)     If the court as a matter of law finds the contract  or any clause of the contract  to have  been  unconscionable  at the  time  it was  made  the court  may  refuse  to enforce  the  contract,  or it may  enforce  the remainder of the contract  without the  unconscionable  clause,  or it may  so limit  the  application  of  any unconscionable clause as to avoid any unconscionable result.

> (2)     When  it is claimed  or appears  to the court that the contract  or any clause thereof may  be unconscionable the parties  shall be afforded a reasonable  opportunity to present  evidence  as to its commercial setting,  purpose   and effect   to aid  the  court  in  making  the determination.

88.     The durational limitation of the warranties accompanying the Cars is unreasonable and unconscionable since the Defendants actively concealed the 3G only limitations. The proposed class representatives and class members had no notice of or ability to detect the issue.

89.     Defendants engaged in unconscionable commercial practices.

90.     Defendants' unconscionable conduct precludes any exclusion of incidental and consequential damages or any other limitation of remedies.  The Defendants' upper-level management orchestrated this wrongful conduct.

91.     The proposed class representative and class members operated and maintained their Cars in conformity with the respective owner's manual and Service and Warranty Information pamphlet.

92.     Car owners have sustained an ascertainable financial loss.  Individuals who own or have owned Cars also sustained diminution of the resale value of their Cars since knowledge of the 3G only limitations of the Cars became public information only after the time of their purchase.

93.     The proposed class representative and class members have not received the benefit of their bargain concerning their respective purchase of Cars.

94.     The Defendants violated the consumer protection laws of New Jersey together with all other state consumer protection laws with their unconscionable conduct described in this complaint including but not limited to their failure to disclose material information that caused ascertainable financial harm to the proposed class representative and class members.

95.     If the proposed class representative and class members had been made aware of the 3G only limitations in their respective Cars and the attendant ramifications of value, safety and care,  they would not have purchased the Cars or would have paid less for their vehicles.

96.     As a direct result of these knowing misrepresentations and omissions, the proposed class representative and class members purchased Cars and sustained economic harm since they purchased vehicles worth considerably less than represented.  These misrepresentations diminish the value and increased cost of vehicle ownership.

97.     The wrongful conduct of the Defendants in violation of the consumer protection laws of New Jersey together with all other state consumer protection laws occurred within the limitations period set out in the respective statutes and/or the limitations period is tolled by the Defendants' conduct.

## THE INJURIES SUFFERED BY PLAINTIFF AND OTHER CLASS MEMBERS

98.     Plaintiff and all purchasers  and lessees of the Cars (who, as detailed below are the members of the putative Classes) have suffered injury  and been damaged by Defendants' unconscionable practices and breaches of its warranties.  Specifically,  Plaintiff  and all members of the putative Class paid for a Car that was represented and warranted by description as including CD/BA which could "adapt" to changing technology, but the Cars they received had 3G Only Limitations which eventually rendered the features inoperable.

99.     Plaintiff and all members of the putative Classes received vehicles that were substantially  less valuable than the vehicles that Defendants  represented and warranted to them, due to the failure of Defendants  to deliver a specific, bargained-for  characteristic.

## COUNT I

**Violations of New Jersey's Consumer Fraud Act, N.J.S.A. § 56:8-2, *et seq.***
**(On Behalf of the Nationwide  Class)**

100.     Plaintiff incorporates the foregoing paragraphs as if fully set forth herein.

101.     Plaintiff brings this claim against BMW on behalf of themselves and the Class.

102.     BMW has engaged in deceptive, unfair, fraudulent and/or misleading commercial practices in the advertising, promotion, marketing, distribution, selling and leasing of Cars.

103.     BMW represented that Cars had characteristics, uses, benefits, or qualities that they did not have.

104.     In its advertising, promotion,  and marketing of the Cars, BMW misrepresented material facts to Plaintiff  and other members of the Class with respect to the vehicles' qualities. As detailed above,  BMW's deceptive advertising, promotion,  and marketing of the Cars emanated  from New Jersey but was originated BMW AG.

105.     BMW's conduct was objectively  deceptive and had the capacity to deceive reasonable  consumers under the circumstances.  The fact that the Cars' CD/BA was not compatible with 5G was a material fact to which a reasonable  consumer would attach importance  at the time of purchase  or lease.

106.     BMW's practices,  as detailed herein,  violated the New Jersey Consumer Fraud Act, N.J.S.A.  56:8-1,  et seq.

107.     As a direct and proximate result of Defendants' violations of the New Jersey Consumer Fraud Act, Plaintiff and other members of the Class have suffered ascertainable losses, which include but are not limited to, the diminished value of their vehicles and the failure to receive the benefit of the bargain promised  to them by Defendants (i.e.,  the vehicles they received were less valuable  at the time of purchase  or lease than the vehicles Defendants

promised to them); and the substantial out-of-pocket costs which will be required to make CD/BA operable on a 5G system. Accordingly, Plaintiff and other members of the Class were harmed by, and Defendants are liable for, Defendants' actions in violation of the New Jersey Consumer Fraud Act.

108.     Defendants are liable to Plaintiff and the members of the Class for treble damages caused by their deceptive conduct, and for reasonable attorneys' fees as set forth in the New Jersey Consumer Fraud Act.

<u>**COUNT II**</u>

**Breach of Express Warranty by Description in Violation of N.J. Stat.§ 12A:2-313(b)**
**(On Behalf of the Nationwide Class)**

109.     Plaintiff incorporates the foregoing paragraphs as if fully set forth herein.

110.     Plaintiff brings this claim against BMW on behalf of themselves and the Nationwide Class pursuant to Section 2-313(b) of the Uniform Commercial Code, adopted under New Jersey law pursuant to N.J. Stat. § 12A:2-313(b). That section provides: "Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to that description."

111.     BMW described CD/BA in its advertisements, press releases, specifications provided to dealers, information provided to the press, and through other media as adaptable to changing technologies which it knew would be communicated to consumers either directly or indirectly. BMW's description included that the CD/BA would function as represented for the life the Cars indefinitely were express warranties by description under N.J. Stat. § 12A:2-313(b).

112.     BMW's express warranties by description were designed to induce Plaintiff and other members of the Class to purchase the Cars.

113.     BMW's express warranties by description became part of the basis of the bargain into which Plaintiff and other members of the Class entered when they purchased the Cars.

114.     Given the modern significance of compatibility of vehicles with cell phones, protocols and wireless standards as represented by BMW's prominent representations. The natural tendency of BMW's descriptions of CD/BA was to induce the purchase or lease of the Cars.

115.     BMW breached its express warranties by description with Plaintiff and other members of the Class by delivering Cars that were not, and never could be, compatible with 5G.

116.     By delivering a vehicle with CD/BA limited to 3G only and lacking compatibility with next generations, BMW has breached its express warranty by description to the purchasers and lessees of the Cars, including the Plaintiff and members of the Class.

117.     As a direct and proximate result of BMW's breach of its express warranties by description with Plaintiff and the members of the Class, Plaintiff and the members of the Class did not receive the full benefit of their bargain and suffered damage by receiving vehicles that were less valuable than the vehicles that Defendants had represented to them, and by paying out-of-pocket costs in order to ensure that the Cars CD/BA features could operate on next generation facilities.

118.     BMW is liable to Plaintiff and the members of the Class for all damages caused by BMW's breach of express warranties by description.

## COUNT III

**Violation Of Magnuson-Moss Warranty Act, 15 U.S.C. §2310(d)1(A)**
**(On Behalf of the Nationwide Class)**

119.    Proposed class representative and class members incorporate by reference all allegations in the above preceding paragraphs as if set forth fully in this count.

120.    This claim is brought as a state law claim under 15 U.S.C. § 2310(d)(l)(A) and is before this Court as a supplemental state court claim for each of the state subclasses pursuant to diversity jurisdiction under CAFA.

121.    The proposed class representative and class members  are consumers within the context of the Magnuson-Moss Warranty Act,  15 U.S.C.  § 2301(3).

122.     Cars are consumer products within the context of the Magnuson-Moss Warranty Act,  15 U.SC.  $  2301(1).

123.    The  Defendants  are  suppliers  and/or  warrantors  within  the  context  of  the Magnuson-Moss Warranty Act,  15 U.S.C.  §§ 2301(4)-(5).

124.    The Defendants' express warranties are written warranties within the context of the Magnuson-Moss Warranty Act,  15 U.$.C.  $ 2301(6).  Cars implied warranties created by operation of state law are incorporated into the Magnuson-Moss Warranty Act as modified by§ 2308.

125.    The Defendants breached the express and implied warranties accompanying Class Vehicles as described in this complaint.

126.    The Magnuson-Moss Warranty Act provides a claim for any consumer  who is damaged by the failure of a warrantor to comply with a written or implied warranty.

127.    The Defendants' breach of their express and implied warranties was the direct and proximate  cause of the proposed  class representative  and proposed  class members' financial

24

harm as more fully set out in the preceding warranty counts, and constitutes a violation of the Magnuson• Moss Warranty Act.

128.    Affording Defendants a reasonable opportunity to cure their breach of written warranties for Class Vehicles would be unnecessary and futile. The proposed class representative and class members have already attempted to secure coverage for their battery-related repairs without success.

129.    At the time of sale or lease of each Class Vehicle, the Defendants knew, should have known, or were reckless in not knowing of their misrepresentations and omissions concerning the Class Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the limitation, as described in this complaint. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Cars resort to an informal dispute resolution procedure and/or afford the Defendants a reasonable opportunity to cure their breach of warranties is excused and thereby deemed satisfied.

130.    The proposed class representative and class members would suffer economic hardship if they returned their Cars but did not receive the return of all payments made by them.

131.    Wherefore, proposed class representative and proposed class members demand judgment against the Defendants including multiple monetary damages, interest, costs and attorney's fees.

## COUNT IV

### Unjust Enrichment

132.     Proposed class representative Hurst and class members incorporate by reference all allegations in the above preceding paragraphs as if set forth fully in this count.

133.     The Defendants breached their express and implied warranties in that Class Vehicles were accompanied by a window sticker, an owner's manual and Service and Warranty Information pamphlet and failed to adequately apprise owners of the 3G only limitation.   Cars were not of merchantable quality and were unfit for the ordinary purposes for which passenger vehicles are used. The owner's manual and Service and Warranty Information pamphlet that failed to adequately apprise vehicle owners of the limitations.

134.     The Defendants benefited financially from their breaches of warranty, misrepresentations and fraud as described in this complaint.  Defendants denied legitimate Class Vehicle battery warranty claims and obtained further unwarranted financial gain.

135.     The proposed class representative and class members sustained monetary damages as described in this complaint.

136.     Allowing the Defendants to retain their monetary enrichment from their wrongful and unlawful acts would be unjust and inequitable.

137.     The proposed class representative and class members request that the Defendants disgorge their profits from their wrongful and unlawful conduct and that the Court establish a constructive trust funded by the benefits conferred upon the Defendants as a result of their wrongful conduct.  The proposed class representative and class members should be designated beneficiaries of the trust and obtain restitution for their out-of-pocket expenses caused by the Defendants' conduct.

138.     Wherefore, the proposed  class representative and class members  demand judgment against defendant for multiple  damages,  interest,  costs and attorneys'  fees.

## PRAYERS FOR RELIEF

WHEREFORE, Plaintiff prays for relief in the form of an order as follows:

a.       Certifying this action as a class action under Federal Rule of Civil Procedure 23, and appointing Plaintiff as class representative and his attorneys as class counsel;

b.       Awarding actual damages to Plaintiff and the Members of the Class;

c.       Awarding attorneys' fees, expenses, and the costs of this suit, together with prejudgment and post-judgment interest at the maximum rate allowed by law; and

d.       Awarding such other and further relief which the Court finds just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims  so triable.

Dated: October 17, 2022

SQUITIERI & FEARON, LLP


By:*/s/Lee Squitieri*
        Lee Squitieri
305 Broadway
7th Floor
New York, New York 10007
(212) 421-6492

27